IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

| | | |
|---|---|---|
| DOROTHY McCURDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 3:14cv226-MHT |
| | ) | (WO) |
| AUBURN UNIVERSITY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

Plaintiff Dorothy McCurdy brings this action
naming, as defendants, Auburn University and several of
its employees (Daniel King, Lloyd Albert, Rick Traylor,
and Chuck Gerards) and asserting that she was paid
less, denied a promotion, and subjected to a
hostile-work environment based on her race in violation
of Title VII of the Civil Rights Act of 1964, as
amended (42 U.S.C. §§ 1981a & 2000e through 2000e-17),
and the Civil Rights Act of 1866, as amended (42 U.S.C.
§ 1981).  The court has federal-question jurisdiction

under 42 U.S.C. § 2000e-5(f)(3) (Title VII) and 28 U.S.C. § 1343(a)(3) (civil rights). The case is now before this court on the defendants' motion to dismiss. The motion to dismiss will be granted in part and denied in part.

## I. LEGAL STANDARD

In considering the defendants' motion to dismiss, the court accepts the plaintiff's allegations as true, Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor, Duke v. Cleland, 5 F.3d 1399, 1402 (11th Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007). Rather, the complaint must contain "only

enough facts to state a claim to relief that is plausible on its face." Id. at 574.

## II. BACKGROUND

Plaintiff McCurdy's factual allegations, taken as true on the defendants' dismissal motion, are as follows: McCurdy (black) has worked in the Work Management Department at Auburn University for 25 years. Since she started in 1989, she has changed roles and management responsibilities a number of times. She managed anywhere between one and eight employees and was promoted to supervisor, demoted with a corresponding loss in pay, and then promoted once again to the same position by 2003.

This litigation stems largely from McCurdy's treatment from 2009 to the present. By 2009, she had the job title of "supervisor" but performed all the work of the "manager" position, which is one rung up the ladder. The directors of the department had

3

already promoted to manager other employees doing equivalent work to McCurdy's. All of these other employees, including her immediate boss in the stockroom, are white.

Noticing this discrepancy, McCurdy approached defendant Traylor (white), the Director of Human Resources, in April 2009, and requested a job reclassification from supervisor to manager. She did not hear any response for nine months, at which point Traylor said he would get back to her. After another month passed without any contact, she contacted Traylor again, who said he was simply waiting on defendant King (white), a high-level manager in the department, to sign the reclassification papers.

One month later, Traylor stated that he could not give McCurdy an answer because he needed to speak with defendant Albert (white), the Director of Maintenance, who was higher up in McCurdy's chain of command. Finally, in October 2010--a year and a half after her

4

initial request--McCurdy met with Albert and Traylor, at which point they denied her reclassification request. McCurdy then asked Albert his plans for the department, to which he responded that she "could go back to where she came from." Second Am. Compl. (doc. no. 28) ¶ 22. Following this meeting, McCurdy repeatedly asked Traylor to set up a meeting with King, but Traylor never did. In August 2012, almost two years after this meeting, McCurdy received formal, written notice from defendant Gerards (white) that Auburn University had denied her request for reclassification.

During and after this multi-year reclassification process, McCurdy attended managers' meetings even though she was a supervisor. She was the only non-white person and the only supervisor at the meetings. At these meetings, other managers routinely asked Albert for assistance, such as additional employees, and he would regularly grant those requests;

however, when McCurdy requested assistance, Albert almost always denied her requests except on a few occasions where he allowed her to appoint a temporary employee.

Starting in January 2013, the managers' treatment of McCurdy at these meetings worsened.  They would make comments about her "not fitting in with everyone else." Second Am. Compl. (doc. no. 28) ¶ 28.  They not only refused to help her when asked but also would skip over her--and only her--when asking for input or discussion. The managers also displayed unfriendly body language and cast snide glances towards her.

In June 2013, McCurdy filed a charge with the Equal Employment Opportunity Commission (EEOC).[1]  The charge

_____

1. The defendants attached the EEOC charge to their first motion to dismiss (doc. no. 13), which they incorporated by reference into their second motion to dismiss.  See Defs.' Ojb. to Second Am. Compl. or in the Alternative Mot. to Dismiss Second Am. Compl. (doc. no. 32) at 19.

(continued...)

relays most of the facts above, noting that management
refused her promotion request in March 2010 and that
its treatment of her created a hostile environment.  It
notes she was the only supervisor and only black person

---

The standard for whether the court may consider
this document differs depending on whether the
defendants' motion is a motion to dismiss based on
jurisdiction under Federal Rule of Civil Procedure
12(b)(1) or for failure to state a claim under Rule
12(b)(6).  While the Eleventh Circuit has been unclear
on whether an exhaustion challenge to a Title VII claim
falls under Rule 12(b)(1) or Rule 12(b)(6), the court
may consider the EEOC charge under either standard.
See Goodridge v. Astrue, 2008 WL 8691093 (N.D. Ga.
2008) (Vineyard, M.J.) (laying out Eleventh Circuit
precedent).

There is no issue in reviewing the EEOC charge for
Rule 12(b)(1) motions because the court "may consider
extrinsic evidence such as deposition testimony and
affidavits." Odyssey Marine Exploration, Inc. v.
Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1169
(11th Cir. 2011) (internal quotation marks omitted).

As for 12(b)(6), a "court may consider a document
attached to a motion to dismiss without converting the
motion into one for summary judgment if the attached
document is (1) central to the plaintiff's claim and
(2) undisputed." Day v. Taylor, 400 F.3d 1272, 1276
(11th Cir. 2005).  The EEOC charge is both central to
the Title VII claims, and its authenticity is
unquestioned.

in the managers' meetings and that she did not receive the same support as the managers.   After filing the EEOC charge, McCurdy received a right-to-sue letter.

## III. DISCUSSION

McCurdy claims that she was paid less, denied a promotion, and subjected to a hostile-work environment because she is black.   She brings a Title VII race-discrimination (pay) claim against Auburn University; a § 1981 race-discrimination (failure-to-promote) claim against King, Albert, Traylor, and Gerards; a Title VII hostile-work-environment claim against the university; and a § 1981 hostile-work-environment claim against Albert.[2]   The defendants move to dismiss each claim. The court will address each argument in turn.

---

2.   While both of the Title VII claims in the complaint mention the right to be free of discrimination based on race and sex, the pay-discrimination claim is titled "Title VII: Race (continued...)

8

## A. Title VII Pay-Discrimination Claim

McCurdy first claims that, in violation of Title VII, Auburn University paid her less than white colleagues performing the same work.[3]   Auburn moves to dismiss, first arguing that McCurdy failed to exhaust the required administrative procedures prior to filing

---

Discrimination" and both the Title VII claims ask for relief that only deals with race.  Additionally, when describing the Title VII hostile-work-environment claim in the opposition to the motion to dismiss (doc. no. 35) at 4, McCurdy alleges that "she was treated as an outcast by her superiors and counterparts because of her race." (emphasis added).  She does not mention her sex.  The court therefore finds that she does not allege a sex-discrimination claim.  If she intended to do so, she should seek leave to amend her complaint to make it clear.

3. A plaintiff may make out a prima-facie case of pay discrimination by establishing that "(1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage."  Cooper v. S. Co., 390 F.3d 695, 735 (11th Cir. 2004), overruled on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006).

this lawsuit in that her EEOC charge did not include an allegation of pay discrimination.

Before filing a Title VII action, "a plaintiff first must file a charge of discrimination with the EEOC." Gregory v. Georgia Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004). "The purpose of this exhaustion requirement is that the EEOC should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." Id. (internal quotation marks omitted).

In order to exhaust, a plaintiff's EEOC charge must put the EEOC on notice of the basis for the discrimination (race, sex, religion, etc.) and the theory for such discrimination (firing, failure to promote, hostile-work environment, etc.). However, it need not be precise pleading; indeed, courts are "extremely reluctant to allow procedural technicalities

10

to bar claims brought under Title VII" and thus "the scope of an EEOC charge should not be strictly interpreted." Id. at 1279 (internal quotation marks omitted). The ultimate question is whether the contentions in the legal complaint were "like or related to, or grew out of, the allegations contained in [the] EEOC charge" such that a "reasonable EEOC investigator" could have accomplished her role of investigating and seeking voluntary settlement of the claim. Id.

Gregory provides an example of this generous standard. In that case, the plaintiff, an African-American doctor, was hired by a state hospital but was fired six months later after making internal complaints to management about discrimination. On her EEOC charge, she stated that she was fired for "no legitimate reason" and checked the boxes for race and sex discrimination but not for retaliation. Id. at 1278-79. Nevertheless, the appellate court found she

11

had exhausted her claim with the EEOC because a reasonable investigator would have examined the reasons for Gregory's firing and realized it was related to earlier complaints about discrimination to her supervisor. Id. at 1280.

Applying Gregory's generous standard, this court finds that the pay-discrimination claim grows out of the EEOC charge. As a threshold, a pay-discrimination claim will not always arise out of a failure-to-promote claim. See, e.g., Jerome v. Marriott Residence Inn Barcelo Crestline/AIG, 211 Fed. App'x 844 (11th Cir. 2006); Ezekiel v. Tift Cnty. Sch. Dist., 2010 WL 431977, at *4-*5 (M.D. Ga. 2010) (Lawson, J.) (refusing to read disparate-pay claim into EEOC charge that focused on failure to promote into a director of human resources position).[4]  Indeed, it depends on the theory

_____

4. These cases are persuasive, but not binding, authority.  While the court agrees with these cases that pay-discrimination claims do not necessarily arise out of failure-to-promote claims in an EEOC charge, it (continued...)

12

of the failure-to-promote claim.  For example, take the
difference between a failure-to-promote claim that
contends a candidate is qualified to do a job that
includes additional responsibilities and a
failure-to-promote claim that contends a candidate
should have been promoted because she is already
essentially doing the same job as that of her
comparators at the higher position.  The first
theory--that the candidate is qualified to take on a
job with additional responsibilities--would focus on a
candidate's readiness for the new job.  While this
theory would entail looking at comparators' past
experiences, it would not necessarily require comparing
minutia of the candidate's and the comparators' current
job responsibilities and pay.  On the other hand, the
second theory--that a candidate was essentially doing
the same job as that of her comparators but was not

---

does not reach whether those cases correctly applied
this legal concept to the facts at issue.

13

promoted to the same position--would focus on whether her job and her comparators' job were essentially the same, an assessment that would normally encompass a comparison of her responsibilities and pay with her comparators' responsibilities and pay.  At the least, a reasonable investigator comparing current jobs to determine if they are comparable would look at compensation; a reasonable investigator comparing suitability for a new job may not.

This case falls under the failure-to-promote theory that McCurdy was essentially performing the same job (that is, had essentially the same responsibilities) as her comparators were but was not promoted to the same position.  The EEOC charge focuses on a job reclassification, which would have been a promotion, but does not appear to entail additional responsibilities.  Moreover, the charge mentions that McCurdy was the only supervisor in the manager's meetings, implying that she had similar

14

responsibilities to those in the meeting but had a lower title and was paid less. As discussed above, a reasonable investigator looking into her claims would wonder why she had the same responsibilities as white managers but was classified lower, and likely paid less, than they. See Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992) (requiring that plaintiff in pay-discrimination suit "shared the same type of tasks" as comparators); cf. Alexander v. Chattahoochee Valley Cmty. Coll., 325 F. Supp. 2d 1274, 1293 (M.D. Ala. 2004) (Thompson, J.) (noting that, in the context of the Equal Pay Act, 29 U.S.C. § 206(d), "[a]lthough job titles and descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content.") (internal quotation marks omitted).

Auburn University next contends that, regardless of what was in the EEOC charge, the complaint here was

confusing to the point where "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." <u>Paylor v. Hartford Fire Ins. Co.</u>, 748 F.3d 1117, 1126 (11th Cir. 2014) (internal quotation marks omitted). The complaint is not a model of clarity; nevertheless, it does put the defendants on notice of a pay-discrimination theory. <u>See</u> Second Am. Compl. (doc. no. 28) ¶ 19 ("Because Plaintiff was already performing the duties and role as a manager, she avers that she was intentionally being held at a lower level with lower pay due to her race, given that all of the other managers were white males. ... Plaintiff avers that her lower pay was a direct result of intentional discrimination on the basis of race."). At worst, the university had to respond to both pay-discrimination and failure-to-promote theories under Title VII, which should not have come as a surprise, much less been "virtually impossible" to divine, given the statement

16

within the complaint.  That McCurdy clarified that her Title VII argument was for pay discrimination rather than both in the reply (quite possibly in response to the university's arguments) does not mean that the university did not have notice of a pay-discrimination theory.  <u>Paylor</u>, 748 F.3d at 1126.

The court therefore will not dismiss the pay-discrimination claim.

### B. § 1981 Failure-to-Promote Claim

McCurdy next claims that, in violation of 42 U.S.C. § 1981 (through the vehicle of 42 U.S.C. § 1983), Albert, Traylor, King, and Gerards did not promote her to manager because she is black.  Each defendant moves to dismiss the claim.

Section 1981 provides that "All persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens...." 42 U.S.C. § 1981.  Failure-to-promote claims under this section

17

have "the same requirements of proof and use the same analytical framework as Title VII." <u>McNeal v. City of Tarrant</u>, 325 Fed. App'x 794, 796 (11th Cir. 2009) (quoting <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998)) (internal quotation marks omitted).  A plaintiff may make out a prima-facie case by showing "(i) that the plaintiff belongs to a protected class; (ii) that she applied for and was qualified for a promotion; (iii) that she was rejected despite her qualifications; and (iv) that other equally or less-qualified comparators outside her class were promoted." <u>Brown v. Alabama Dep't of Transp.</u>, 597 F.3d 1160, 1174 (11th Cir. 2010).  While a plaintiff need not allege facts on every element of the prima-facie case in the complaint, the elements can be a "helpful guide" in determining whether a claim is plausible at the motion to dismiss phase. <u>Powell v. Harsco Metal</u>, 2013 WL 3242759, at *5 (N.D. Ala. 2013) (Hopkins, J.)

(citing <u>Bowers v. Bd. Of Regents of Univ. Sys. Of
Georgia</u>, 509 Fed. App'x 906, 910 (11th Cir. 2013)).

McCurdy pleads each prong of the prima-facie case.
She is a black woman who applied for a promotion from
supervisor to manager. Although she had been
performing the duties of the manager already--and thus
was qualified to do the job--she was rejected for
reclassification. Finally, she identifies comparators:
the current white managers who had the same job duties
as she but had been made managers. Although not
necessary to make out a prima-facie case, she also
notes the 18-month delay in getting an answer to her
promotion request, and the allegedly racially tinged
remark--"go back to where she came from"--when that
request was finally denied.

Before turning to the individual defendants, the
court must address the defendants' contention that the
remark "go back to where she came from," a variant of
"go back to where you came from," is not inherently

19

racial and therefore should not be considered because it did not have a racial connotation here.  The court agrees it is not necessarily racial in all contexts. Indeed, "[t]he speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."  Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006).  For example, in Ash, the Supreme Court held that although the word "boy" was not inherently racial, it did not have to be prefaced or modified by a racial classification or slur to be probative of bias when two black employees were referred to as "boy" by the plant manager.

The phrase "go back to where you came from" has a similar historical context to the term "boy."  Even without an explicit racial slur, when told to a black worker, it can easily mean "go back to Africa," a common slur that courts have recognized before.  See, e.g., Hollis v. Austal, U.S.A., L.L.C., 2014 WL 4375988, at *3 (S.D. Ala. 2014) (Dubos, J.); Mandewah

20

<u>v. Wisconsin Dep't of Corr.</u>, 2009 WL 1702089, at *5 (E.D. Wis. 2009) (Adelman, J.).   Indeed, at least one court has recorded "go back to where you came from" in the context of other slurs.   <u>Zeno v. Pine Plains Cent. Sch. Dist.</u>, 702 F.3d 655, 660 (2d Cir. 2012).

While defendants acknowledge this statement could be read as a racial comment, they insist that a more likely explanation is that Albert was simply telling McCurdy "to go back to where she came from--<u>the stockroom.</u>" Mot. to Dismiss (doc. no. 32) at 12 (internal quotation marks omitted).   This interpretation seems dubious.   It would be unnatural phrasing, at best, for a white manager to tell a black employee to "go back where you came from" and mean "return to your work in the stockroom."   Although possible, the defendants' version of this exchange is not a "more likely explanation" that undermines the plausible reading of the statement as a racially tinged

remark.   See Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009).

Although McCurdy does plead a prima-facie case, the question remains: against whom? McCurdy pleads her § 1981 claim through the procedural vehicle of § 1983. Under § 1983 a person may be sued for his own violation of a plaintiff's rights (direct liability) or, in discrete circumstances, the actions of his subordinates (supervisory liability).   Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004). Although unclear from the complaint, it appears that McCurdy pleads direct liability against four individual defendants--Albert, Traylor, King, and Gerards.

The claim is plausible to the extent it is against Albert and Traylor.   When McCurdy approached Traylor, the Human Resources Director, for a reclassification, he took nine months to acknowledge her request and well over a year to set up the meeting with Albert and McCurdy.   Albert, the director in her chain of command,

22

told her in that meeting that he had no plans to promote her and told her "to go back to where she came from." From the pleading, Albert and Traylor both appear to have had active roles in the alleged discrimination and the apparent authority to promote McCurdy.

The claim is likewise plausible to the extent it is against King. According to the complaint, Traylor went to King to sign McCurdy's reclassification papers, but King did not sign them. Additionally, Traylor agreed to set up a meeting between McCurdy and King after she was told that she would not be reclassified, but the meeting never occurred. King, as the high-level manager in the department, with apparent authority to grant the reclassification, refused to grant a promotion or meet with McCurdy. Taking the complaint as true, and construing it in McCurdy's favor, King failed to promote McCurdy, knowing that others, outside

the protected class, had been promoted for doing the same work.

The claim, however, is due to be dismissed, as to Gerards.  There is little information about Gerards in the complaint.  The complaint states only that McCurdy "received written notice from" Gerards that her request for a promotion was denied, but it does not state Gerards's role at Auburn University, his part in the firing, or any animus he had based on McCurdy's race.  Given the complete lack of information on Gerards in the complaint, McCurdy's claim to the extent it is against him is not plausible.

To the extent McCurdy implies supervisory liability against Gerards, the claim also is not plausible and does not put him on notice.  "It is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates unless the supervisor personally participates in the alleged constitutional violation or

24

there is a causal connection between actions of the
supervising official and the alleged constitutional
deprivation." <u>Doe v. Sch. Bd. of Broward Cnty., Fla.</u>,
604 F.3d 1248, 1266 (11th Cir. 2010) (internal
citations and quotation marks omitted). "This
requisite causal connection can be established in the
following circumstances: (1) when a history of
widespread abuse puts the responsible supervisor on
notice of the need to correct the alleged deprivation,
and he fails to do so or (2) when a supervisor's
improper custom or policy results in deliberate
indifference to constitutional rights. For a history
of abuse to be sufficiently widespread to put a
supervisor on notice, the abuse must be obvious,
flagrant, rampant and of continued duration, rather
than isolated occurrences." <u>Id</u>. (internal citations
and quotation marks omitted). As detailed above,
McCurdy does not allege a plausible claim that Gerards
was involved personally in the constitutional

violation.   There is also no pleading of widespread abuse that would have put Gerards on notice, of him directing Albert, Traylor, or King in their actions, or of an unofficial custom or policy of discrimination.

The court therefore denies the motion to dismiss the § 1981 failure-to-promote claim to the extent it is against Traylor, Albert, and King but grants the motion to dismiss the § 1981 failure-to-promote claim as to Gerards.


## C. Hostile-Work-Environment Claims

McCurdy last charges a hostile-work environment based on race against Auburn University under Title VII and against Albert under § 1981.   Each defendant moves to dismiss.


### 1. Title VII

Under Title VII, an employee may establish a hostile-work-environment claim if "the workplace is

26

permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). To prove a claim of hostile-work environment under Title VII, an employee must show: "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee ... (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." <u>Id.</u>

Auburn University argues that McCurdy's claim is time-barred, because she failed to file her EEOC charge within the relevant statutory period.  It also argues that she fails to plead conduct that is plausibly severe or pervasive.  The court will take each argument in turn.

42 U.S.C. § 2000e-5(e)(1) "is a charge filing provision that specifies with precision the prerequisites that a plaintiff must satisfy before filing [a Title VII] suit." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) (internal citations omitted).  With exceptions not relevant here, the statute requires a potential Title VII plaintiff to file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).  Plaintiffs may not sue on discrete acts of discrimination that occur outside this statutory time period. Morgan, 536 U.S. at 113. However, under the 'continuing violation' doctrine,

28

when a plaintiff alleges a hostile-work environment, the alleged violation is not any particular, discrete act of harassment, but the cumulative result of "a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 117. As long as one "act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id.

Under the continuing-violation doctrine, the acts occurring within the statutory period need not, on their own, be actionable. Instead, they need merely contribute to the same unlawful employment practice. See Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) ("Put simply, if the smallest portion of that 'practice' occurred within the limitations time period, then the court should consider it as a whole."). "The pivotal question is whether the timely discrete acts are sufficiently related to the hostile

29

work environment claim"--that is, whether the acts
"were the same type of discriminatory intimidation,
ridicule, and insult that characterized the untimely
allegations." <u>Chambless v. Louisiana-Pac. Corp.</u>, 481
F.3d 1345, 1350 (11th Cir. 2007) (internal quotation
marks omitted).

McCurdy filed her EEOC charge in June 2013, making
the relevant 180-day time period between December 2012
and June 2013. During the "many" manager meetings in
this timeframe, her bosses would skip over her in favor
of her white colleagues, and her colleagues would
comment how she "did not fit in" with everyone else.
These actions matched the "type" of activities directed
at her before that period, including when Albert would
refuse her help but grant it to her white colleagues
and his comment that McCurdy should "go back to where
she came from." Indeed, all of these actions--before
and after the 180-day period--marginalized McCurdy in
professional settings based on her race and potentially

affected her work performance.   As such, her claim is
not time-barred.

Auburn University next argues that McCurdy does not
make a plausible claim for severe or pervasive conduct.
When determining whether conduct is severe or pervasive
enough to permeate a workplace, courts consider, among
other factors, "(1) the frequency of the conduct; (2)
the severity of the conduct; (3) whether the conduct is
physically threatening or humiliating, or a mere
offensive utterance; and (4) whether the conduct
unreasonably interferes with the employee's job
performance."   Miller, 277 F.3d at 1276 (finding
conduct to be severe or pervasive when co-workers used
racial epithets and prevented the plaintiff from doing
his job on at least one occasion); see also McCann v.
Tillman, 526 F.3d 1370, 1379 (11th Cir. 2008) (granting
summary judgment for defendants on
hostile-work-environment claim where plaintiff was
subject to a few racially charged comments over several

years but did not demonstrate her job performance was affected).

McCurdy pleads a plausible claim for relief in her complaint that clearly puts the university on notice. She claims that over a several-year period, managers ignored her requests for help in her job and ignored her in meetings, particularly in the first six months of 2013. In addition, she notes the allegedly racially charged comment from Albert and the comments from other managers that she did not fit in. As the university contends, snide comments, subtle body language, and one racially tinged remark from a direct supervisor are not necessarily enough to plead a hostile-work-environment claim; however, McCurdy claims more. Specifically, her allegations regarding being ignored at meetings and being denied the same help that other employees received at the manager meetings because of her race raise the possibility that the harassment was "so extreme that it produces tangible effects on job

32

performance." See <u>Miller</u>, 277 F.3d at 1277.  The court thus finds that McCurdy pleads a plausible claim that she was subjected to severe and pervasive conduct.[5]


## 2.  § 1981

The same substantive tests apply to hostile-work-environment claims under § 1981 as those under Title VII.  See <u>Bryant v. Jones</u>, 575 F.3d 1281, 1296 (11th Cir. 2009) (applying Title VII framework to § 1981 claim).  The two differences in these claims are that § 1981 does not contain the same exhaustion requirement as Title VII and that the § 1981 claim is brought against Albert rather than Auburn University as a whole.

---

5.  In addition to meeting this objective test, plaintiffs must also subjectively "perceive [the environment] to be abusive."  <u>Miller</u>, 277 F.3d at 1277 (internal quotation marks omitted).  Several of the allegations in the complaint that defendants label as "conclusory," likely go to this subjective test, and the defendants do not challenge McCurdy's subjective feelings as implausible.

Albert played a major role in the behavior discussed above that created a plausible hostile-work-environment claim.  He made the allegedly racially tinged comment that McCurdy "should go back to where she came from," and he ran the manager meetings, where he responded positively to the white managers' requests and called for their input, but routinely ignored McCurdy and turned down her requests.[6]  As with the Title VII claim, the potential impact of Albert's actions on McCurdy's job performance makes this a plausible claim.

                                   ***

For the foregoing reasons, it is ORDERED that the defendants' motion to dismiss (doc. no. 32) is:

(1) Denied as to plaintiff Dorothy McCurdy's

---

6.  McCurdy notes that Albert would occasionally allow her to hire temporary employees, but that these temporary employees required constant training and retraining unlike permanent employees.

Title VII pay-discrimination claim against defendant Auburn University.

(2) Granted as to plaintiff McCurdy's § 1981 failure-to-promote claim against defendant Chuck Gerards but denied for plaintiff McCurdy's § 1981 failure-to-promote claim against defendants Lloyd Albert, Rick Traylor, and Daniel King.

(3) Denied as to plaintiff McCurdy's Title VII hostile-work-environment claim against defendant Auburn University and her § 1981 hostile-work-environment claim against defendant Lloyd Albert.

DONE, this the 4th day of May, 2015.

         /s/ Myron H. Thompson____
        UNITED STATES DISTRICT JUDGE